**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NICHOLAS FORCIER and TAMEKA WATSON individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>EMPOWER CLINIC SERVICES, LLC, d/b/a EMPOWER PHARMACY; EMPOWER CLINIC SERVICES NEW JERSEY LLC, d/b/a EMPOWER PHARMA<br><br>*Defendants.* | Case No.: 26-cv-14183<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Nicholas Forcier and Tameka Watson ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" and each member, a "Class Member," defined further below), bring this class action complaint against Defendants Empower Clinic Services, LLC d/b/a Empower Pharmacy and Empower Clinic Services New Jersey LLC d/b/a Empower Pharma (collectively, "Empower" or "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action on behalf of a nationwide class of consumers who purchased or received Empower's compounded GLP-1 medications, including formulations containing tirzepatide and semaglutide, which Empower deceptively marketed as safe, effective, clinically supported, and "personalized" treatments for weight management and metabolic health.

2. Empower operates a large-scale compounding pharmacy that manufactures compounded versions of the GLP-1 medications tirzepatide and semaglutide, active ingredients

found in FDA-approved medications such as MOUNJARO®, ZEPBOUND®, OZEMPIC®, and WEGOVY® (collectively, "Authorized GLP-1s").

3. Empower's GLP-1 products include both an injectable semaglutide / vitamin B mix and an orally disintegrating tablet ("ODT") version. Similarly, Empower sells an injectable tirzepatide / vitamin B mix and an ODT version (collectively with Empower's compounded semaglutide-containing drugs, the "Products" and each, a "Product").

4. Through its website and marketing materials, Empower promotes these Products directly to consumers as safe, effective, and clinically supported. However, these representations are false and misleading in at least three respects:

(a) Empower relies on studies of FDA-approved, Authorized GLP-1 drugs to promote its compounded formulations. But Empower's Products have not been FDA-approved or clinically tested. By citing studies of Authorized GLP-1s to promote their unauthorized Products, Empower creates the misleading impression that its Products have been clinically tested and proven effective, when no such testing actually occurred.

(b) Empower sells the Products on a promise that they are custom-made, or "personalized." That promise is empty: Empower dispenses off-the-shelf formulations offered in fixed sets of dosages. The principal variable distinguishing the Products from the approved medicines they imitate is the addition of vitamin B compounds, which Empower adds uniformly and then markets as bespoke care.

(c) Empower assures consumers that its operations satisfy, and exceed, what state boards of pharmacy and federal law require. The regulatory record is to the contrary. Inspectors at both levels of government have documented recurrent breakdowns in Empower's manufacturing controls. And one of Empower's former executives has alleged

that the company conceals such breakdowns from the very regulators charged with detecting them.

5. As detailed below, Empower's deceptive conduct poses serious risks to patient safety. Indeed, as recently as September 2026, the FDA has warned that Empower's facilities are improperly compounding medications.

6. As a result of Empower's deceptive marketing, consumers have paid substantial sums for compounded GLP-1 medications that they would not have purchased had Empower truthfully disclosed that its products have never been clinically tested, are not personalized, and are manufactured in unsafe and unsanitary facilities that do not meet the standards to which Empower claims to adhere.

7. Plaintiffs do not seek to enforce the federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, or any regulation promulgated thereunder. Instead, Plaintiffs' claims rest exclusively on traditional, generally applicable state-law theories of deceptive marketing, false advertising, unfair competition, and unjust enrichment—causes of action that exist independent of federal law. References in this Complaint to federal regulatory observations or findings are pled solely as evidence of the falsity, materiality, and consumer impact of Empower's own affirmative marketing representations; they do not state, and are not intended to state, a private claim for enforcement of the FDCA.

8. To protect consumers and to stop Empower's deception, Plaintiffs bring this action pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq.*; New York General Business Law § 349 (unfair, deceptive, or abusive acts) and § 350 (false advertising); the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505; breach of express warranty, and common law theories of unjust enrichment.

## PARTIES

9. Plaintiff Nicholas Forcier is a citizen of the State of New York. During the Class Period (as defined below), while in New York, Mr. Forcier purchased a Product manufactured by Empower, including tirzepatide, for which he paid $199 a month. Mr. Forcier purchased these medications in reliance on Empower's representations that its compounded GLP-1 products were safe, effective, clinically supported, personalized, and manufactured in compliance with strict safety standards. Had Mr. Forcier known the truth about Empower's products, he would not have purchased them. Moreover, Mr. Forcier was personally exposed to Empower's direct-to-consumer marketing for the Products before and after he purchased those Products, including by visiting one or more of Empower's consumer-facing product pages at www.empowerpharmacy.com. Mr. Forcier read and reasonably relied on Empower's representations that its Products were safe, effective, clinically supported, "personalized," and manufactured in compliance with stringent safety standards, and these representations were a substantial factor in his decision to purchase the Product.

10. Plaintiff Tameka Watson is a citizen of the State of Illinois. During the Class Period, while in Illinois, Ms. Watson purchased a Product manufactured by Empower, including injectable semaglutide, for which she paid $499 for a supply of several months. Ms. Watson purchased these medications in reliance on Empower's representations that its compounded GLP-1 products were safe, effective, clinically supported, personalized, and manufactured in compliance with strict safety standards. Had Ms. Watson known the truth about Empower's products, she would not have purchased them.

11. Upon information and belief, Defendant Empower Clinic Services, LLC is a Texas limited liability company with a principal place of business at 7601 N Sam Houston Parkway W,

Ste 100, Houston, TX 77064, doing business as Empower Pharmacy. Empower Clinic Services, LLC holds out-of-state pharmacy licenses in New Jersey and is the ultimate owner of a facility that operates or operated as a 503A compounding pharmacy and 503B outsourcing facility located at 203 Windsor Center Drive, Suite A16, East Windsor, New Jersey 08520 ("East Windsor Facility").

12. Upon information and belief, Defendant Empower Clinic Services New Jersey LLC ("Empower NJ" and together with Empower Clinic Services, LLC, "Empower") is a Delaware limited liability company with its principal place of business at 203 Windsor Center Drive, Suite A16, East Windsor, New Jersey 08520. Empower NJ is also a registered foreign limited liability company in the state of New Jersey. Empower NJ a wholly owned subsidiary of Empower Clinic Services, LLC and, on information and belief, is under common ownership and control.

13. On information and belief, the Products purchased by Plaintiffs and Class members were compounded at, and/or shipped from, Empower's East Windsor Facility. On information and belief, the decisions to market the Products in the manner described in this Complaint, and the representations challenged herein, were made and disseminated from Empower's operations in New Jersey and/or Texas.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act), because this is a class action in which (a) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) the proposed class consists of more than 100 members; and (c) at least one member of the proposed class is a citizen of a state different from Defendants.

15. This Court may exercise personal jurisdiction over each Defendant. Empower

Clinic Services, LLC and Empower NJ are licensed to conduct business in New Jersey pursuant to out-of-state pharmacy licenses.[1] Empower operates and conducts business in New Jersey by promoting and selling its compounded products here through its website, which specifically targets New Jersey residents and providers by promising that Empower is "[l]icensed to ship to New Jersey" and is "Your New Jersey compounding pharmacy solution."[2]

16. That solicitation is aimed at both prescribers and potential consumers. On the same page Empower represents: "With New Jersey Board of Pharmacy certifications in both patient-specific and office-use medications, we support practitioners, healthcare businesses, and patients across the state. Whether it be Newark, Paterson, Elizabeth, or Edison – businesses and patients living in New Jersey can receive our products in the shortest turnaround times."[3]

17. Empower further promises New Jerseyans that they can buy Empower products, and conducts business with health care providers who operate in New Jersey, including Ethos Spa, which has seven locations,[4] all in New Jersey.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Empower operates and conducts business in New Jersey, including by engaging in its unlawful promotion and deceptive sale of compounded GLP-1 products here pursuant to New Jersey pharmacy licenses and by shipping the at-issue products here.

---

[1] *See* Empower Pharmacy Shipping Coverage – New Jersey Page, https://www.empowerpharmacy.com/compounding-pharmacy-shipping-coverage/new-jersey/.

[2] *Id.*

[3] *Id.*

[4] Ethos Spa, Tirzepatide for Weight Loss: A Comprehensive Guide, https://web.archive.org/web/20251016062706/https://myethosspa.com/tirzepatide-for-weight-loss/ (archived Oct. 16, 2025); Ethos Spa, *How Much Do hCG Injections Cost for Men?*, https://myethosspa.com/cost-of-hcg-injections-for-men/ (listing pricing for hCG injections "offered by Empower Pharmacy").

## COMMON FACTUAL ALLEGATIONS

### A. FDA-APPROVED GLP-1 MEDICATIONS

19. Tirzepatide is the active ingredient in Eli Lilly and Company's MOUNJARO® and ZEPBOUND®, the only FDA-approved tirzepatide medicines in the United States. MOUNJARO® is FDA-approved to treat type 2 diabetes, and ZEPBOUND® is approved to treat chronic weight management and obstructive sleep apnea in certain adults. Lilly's tirzepatide medicines are available only as injections, not in any oral form, and are not available combined with additives such as niacinamide (vitamin B).

20. Semaglutide is the active ingredient in Novo Nordisk's OZEMPIC® and WEGOVY®. OZEMPIC® is FDA-approved to treat type 2 diabetes and WEGOVY® is FDA-approved for chronic weight management. Like tirzepatide, FDA-approved semaglutide injectables underwent extensive clinical testing before receiving approval. Novo Nordisk additionally sells FDA-approved oral semaglutide tablets: RYBELSUS®, approved for type 2 diabetes, and, since December 2025, an oral formulation of WEGOVY® approved for chronic weight management.[5]

### B. DRUG COMPOUNDING

#### a. Compounded Drugs Are Not FDA Approved

21. Unlike Authorized GLP-1s, "compounded" drugs like the Products are not FDA approved.

22. Compounding is a narrowly authorized practice. Licensed pharmacists and physicians — and, at outsourcing facilities, personnel working under a pharmacist's supervision

[5] Novo Nordisk A/S, Form 6-K (Dec. 22, 2025), https://www.sec.gov/Archives/edgar/data/353278/000117184325008080/f6k_122225.htm (announcing FDA approval of the Wegovy® pill, oral semaglutide 25 mg, for weight reduction and maintenance).

— may combine, mix or alter "ingredients of a drug to create a medication tailored to the needs of an individual patient."[6] One paradigm case is intolerance: where a patient is allergic to or sensitive to an inactive ingredient contained in a commercially available medicine, a compounder may prepare that medicine without it.

23. As FDA itself makes clear, "[c]ompounded drugs are not FDA-approved."[7] Unlike FDA-approved medications, no part of the compounding pathway requires that a formulation be studied in patients before it is sold, and FDA does not assess compounded preparations for safety or effectiveness before they reach the people who take them.

24. For these reasons, FDA has expressly warned that "[c]ompounded drugs . . . do not have the same safety, quality, and effectiveness assurances as approved drugs. Unnecessary use of compounded drugs . . . exposes patients to potentially serious health risks."[8]

25. In fact, the FDA specifically directed a warning towards consumers of compounded GLP-1 products, cautioning that those products "have not undergone FDA premarket review for safety, effectiveness, and quality, and lack a premarket inspection and finding of manufacturing quality that is part of the drug approval process."[9] State attorneys general have issued warnings to the same effect, as have professional medical bodies in the diabetes, endocrinology and obesity-

[6] FDA, Human Drug Compounding (Dec. 18, 2024), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.

[7] FDA, Compounding and the FDA: Questions and Answers (Nov. 15, 2024), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[8] FDA, Compounding and the FDA: Questions and Answers (June 29, 2022), https://web.archive.org/web/20240803214713/https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[9] FDA, Declaratory Order: Resolution of Shortages of Tirzepatide Injection Products (Mounjaro and Zepbound), at 10 (Dec. 19, 2024), https://www.fda.gov/media/184606/download; *see also* Letter from Shannon Glueck, Branch Chief, FDA Compounding Branch 4, to Philip Dickison, CEO, Nat'l Council of State Boards of Nursing (July 16, 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/department-and-offices/bpoa/nursing/fda-safety-alert.pdf; FDA, FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss (Mar. 17, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

medicine fields.[10]

**b. GLP-1 Shortage and "Personalization" Pivot**

26. Compounding pharmacies are permitted to compound drugs using bulk active ingredients found in FDA-approved products only under narrow conditions. Among the most significant, the FDA may exercise discretion permitting such compounding when an FDA-approved drug is on the FDA's national drug shortage list. Authorized GLP-1s containing both tirzepatide and semaglutide were previously included on that list, which provided the principal regulatory basis under which compounding pharmacies, including Empower, mass-produced compounded versions of those drugs.

27. The shortages of tirzepatide and semaglutide have since been resolved. On October 2, 2024, the FDA announced its determination that the tirzepatide shortage had been resolved, and on December 19, 2024, the FDA issued a declaratory order confirming that the shortage was over.[11]

[10] Nat'l Ass'n of Attorneys General, State and Territory Attorneys General Urge FDA to Take Action Against Counterfeit and Illegally Sold GLP-1 Drugs (Feb. 19, 2025), https://www.naag.org/wp-content/uploads/2025/02/FDA-GLP-1-Ltrhead-e.pdf; Obesity Medicine Ass'n, Leading Obesity Expert Organizations Release Statement to Patients on Compounded GLP-1 Alternatives (Jan. 8, 2024), https://obesitymedicine.org/blog/leading-obesity-expert-organizations-release-statement-to-patients-on-glp-1-compounded-alternatives/; Pediatric Endocrine Society, Statement on use of compounded semaglutide and other GLP-1 receptor agonists (Jan. 16, 2024), https://pedsendo.org/drug-shortages/statement-on-use-of-compounded-semaglutide-and-other-glp-1-receptor-agonists/; Nat'l Consumers League, NCL urges the public to heed warnings about unregulated versions of GLP-1 weight loss drugs (Feb. 4, 2025), https://nclnet.org/the-national-consumers-league-urges-the-public-to-heed-warnings-about-unregulated-versions-of-glp-1-weight-loss-drugs/; American Diabetes Ass'n, The American Diabetes Association Announces Statement on Compounded Incretin Products (Dec. 2, 2024), https://diabetes.org/sites/default/files/2024-12/24.11.8%20compounding%20statement%20press%20release_FINAL.pdf; Ashwin Chetty, et al., Online Advertising of Compounded Glucagon-Like Peptide-1 Receptor Agonists, JAMA HEALTH FORUM, Jan. 3, 2025, https://pubmed.ncbi.nlm.nih.gov/39820389/; Department of Health and Aged Care, Protecting Australians from unsafe compounding of replica weight loss products (May 22, 2024), https://www.health.gov.au/ministers/the-hon-mark-butler-mp/media/protecting-australians-from-unsafe-compounding-of-replica-weight-loss-products; South African Health Products Regulatory Authority, SAHPRA's Position on GLP1 and GIP-GLP1 Products That Are Compounded, Substandard And Falsified (Nov. 8, 2024), https://www.sahpra.org.za/news-and-updates/sahpras-position-on-glp1-and-gip-glp1-products-that-are-compounded-substandard-and-falsifiedas/.

[11] FDA, Declaratory Order: Resolution of Shortages of Tirzepatide Injection Products (Mounjaro and Zepbound) (Dec. 19, 2024), https://www.fda.gov/media/184606/download (confirming both the October 2, 2024 shortage-resolution determination and the December 19, 2024 declaratory order on page 1).

28. On February 21, 2025, the FDA likewise confirmed that the semaglutide shortage was over.[12]

29. After short transition periods set by the FDA, compounders were no longer permitted to mass-produce compounded versions of tirzepatide and semaglutide.

30. Following the resolution of those shortages, the only colorable basis for continuing to compound tirzepatide and semaglutide is genuine patient-specific compounding, i.e., "personalization," which requires a change, made for an identified individual patient, that the prescriber determines produces a significant difference for that patient from the commercially available and FDA-approved medication.

31. Notwithstanding the resolution of these shortages, Empower has continued to mass-produce and market its standardized compounded GLP-1 formulations—including the tirzepatide ODT, the tirzepatide/niacinamide injection, the semaglutide/methylcobalamin ODT, and the semaglutide/cyanocobalamin injection—in predetermined dosages and without any genuine patient-specific compounding. The FDA has since confirmed as much: in a Warning Letter issued September 18, 2026, the agency found that, through at least October 2025, Empower continued to compound its tirzepatide/niacinamide and semaglutide/cyanocobalamin injections "regularly and in inordinate amounts," in volumes that "suggest[] that differences between products [Empower is] compounding and the FDA-approved products are pretextual."[13]

---

[12] FDA, Clarifying Policies for Compounders as National GLP-1 Supply Begins to Stabilize (Feb. 21, 2025), https://www.fda.gov/drugs/drug-alerts-and-statements/fda-clarifies-policies-compounders-national-glp-1-supply-begins-stabilize.

[13] Warning Letter from Clint L. Narver, Director, Office of Compounding Quality and Compliance, FDA Center for Drug Evaluation and Research, to Arta Shaun Noorian, Founder & Chief Executive Officer, Empower Clinic Services, LLC dba Empower Pharmacy, WL #738238 (Sept. 18, 2026), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/empower-clinic-services-llc-dba-empower-pharmacy-738238-09182026.

### C. EMPOWER'S DECEPTIVE PRACTICES AND FALSE CLAIMS

32. The inclusion of "pharmacy" in its branding understates what Empower actually is. It operates at industrial scale and distributes across the country. Empower says so itself, claiming that it is "the largest and most advanced 503A compounding pharmacy in the nation—and the world."[14]

33. Empower operates a nationwide scheme to falsely market and sell its untested products. To do so, Empower misleads consumers about Product safety, effectiveness, quality, and "personalization."

34. As detailed below, Empower makes three categories of false and deceptive representations to consumers: (1) that its Products are safe and effective treatments supported by clinical evidence, when they are not; (2) that its Products are custom-made, "personalized" medications tailored to individual patient needs, when they are not; and (3) that Empower maintains compliance with regulatory requirements and high-quality manufacturing standards, when it does not. On information and belief, Empower makes these false and deceptive representations from the State of New Jersey and/or the State of Texas.

#### a. Empower Deceptively Promotes Untested Products

35. Empower sells its compounded GLP-1 Products to consumers for the advertised purpose of "Weight Management."[15] Although not one of those Products has ever been the subject of a clinical study,[16] Empower nonetheless surrounds them with references to clinical research

[14] Empower Pharmacy, Who We Are, https://web.archive.org/web/20250515081155/https://www.empowerpharmacy.com/about/our-story/.

[15] Empower Pharmacy, Products, https://www.empowerpharmacy.com/compounding-pharmacy/.

[16] Empower's own product pages now concede the point. *See* Empower Pharmacy, Semaglutide / Methylcobalamin ODT, https://www.empowerpharmacy.com/compounding-pharmacy/semaglutide-methylcobalamin-odt/ (last visited Sept. 28, 2026) ("This compounded medication has not undergone clinical trials."); Empower Pharmacy, Tirzepatide ODT, https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-odt/ (last visited Sept. 28, 2026) ("Tirzepatide ODT has not undergone clinical trials or been reviewed by FDA for safety or efficacy.").

conducted on the FDA-approved GLP-1 medications its Products imitate. The juxtaposition is deliberate. It leads consumers to believe that the studies Empower cites describe the Products Empower sells. They do not.

36. A seller that advertises “clinical trials,” “demonstrated” function, and “proven” results represents to the consumer that testing of the kind described has in fact been performed on the product being offered for sale. Where the seller holds no such testing, the representation is false when it is made. That is precisely the character of Empower’s advertising: claims cast in the vocabulary of clinical proof, affixed to Products that have never been clinically tested at all.

37. Nor can Empower cure that deficit by borrowing another manufacturer’s data. A drug’s safety, effectiveness, and bioavailability depend on how it is formulated, how it is administered, at what dose, and what other substances it is combined with. Alter any of those variables and the trial results cease to describe the product in the consumer’s hand. Every one of the Products differs from the FDA-approved drug whose clinical record Empower invokes along at least one of these dimensions: the Tirzepatide ODT in dosage form and route of administration, the tirzepatide/niacinamide and semaglutide/cyanocobalamin injections in their combination with other ingredients, and the semaglutide/methylcobalamin ODT in both. The studies Empower cites therefore supply no evidence of the safety or efficacy of anything Empower sells.

38. Empower has employed this technique across each of its GLP-1 product lines.

### i. Empower’s Compounded Tirzepatide ODT

39. Tirzepatide has been approved, and clinically studied, in a single route of administration: subcutaneous injection. Empower’s Tirzepatide ODT is not an injection but a tablet that dissolves in the mouth. Whether tirzepatide delivered by that route survives to reach the bloodstream, and in what quantity if it does, has never been established, because the clinical study that would answer the question has never been run. Empower cannot say whether the tirzepatide

in its tablets is absorbed in any quantity, much less a quantity capable of producing the effects it advertises. Trials of injectable tirzepatide say nothing on the subject.

40. Empower advertised the tablet as though the subject were settled, making claims about their impact on blood sugar and fat metabolism.[17] Yet Empower possessed no scientific evidence for any of its claims about its oral tablet. Empower deliberately misled consumers by positioning such claims alongside Empower's citations to injectable tirzepatide research, which was calculated to leave the consumer with the impression that the tablet had been tested, and that it worked.

41. Empower reinforced that impression with a convenience pitch that presupposed the equivalence it never established. Empower's website promotes the Tirzepatide ODT as offering "[n]o needles, no refrigeration, no preparation" and "[j]ust an easy, consistent routine."[18] A pitch of that kind is intelligible only if the tablet delivers what the injection delivers. Its message to the consumer is that nothing is forfeited but inconvenience.

42. Empower carried the same message into its social media marketing, telling consumers to "[s]kip the needle and get customized weight management support with the new Tirzepatide ODT."[19] The instruction asks consumers to forgo the only formulation of tirzepatide that has ever been clinically tested, on the assurance that the benefits travel with them. Nothing in the scientific record supports that assurance.

---

[17] Empower Pharmacy, Tirzepatide ODT Product Page, archived by the Internet Archive on February 21, 2025, https://web.archive.org/web/20250221181634/https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-odt/.

[18] Empower, *Tirzepatide* ODT, https://www.empowerpharmacy.com/tirzepatide-odt-launch/.

[19] Empower Pharmacy (empowerpharmacy), Your Weight, Your Way, INSTAGRAM (Dec. 18, 2024), https://www.instagram.com/empowerpharmacy/p/DDu35cbxfFv/.

### ii. Empower's Compounded Tirzepatide/Niacinamide Injection

43. Empower marketed its tirzepatide/niacinamide (vitamin B) combination injection in the same fashion. The "Product Overview" Empower published for this Product told consumers that "[a]ccording to recent clinical studies, tirzepatide decreases hemoglobin A1C levels more effectively than a placebo," that the "SURPASS-5 clinical trial revealed a -2.11% drop in hemoglobin A1C levels at 5mg per week dose," and that "[t]his was proven during a 40-week period."[20] Empower added that "[t]irzepatide has been demonstrated to function similarly to GLP-1 medicines but more effectively."

44. The trials Empower invoked, SURPASS-5 among them, studied tirzepatide by itself, at approved dosages. Empower does not sell tirzepatide by itself. It sells tirzepatide combined with niacinamide, and, by Lilly's count, of the 37 clinical trials conducted on tirzepatide, not one examined that combination.[21] No study establishes, or so much as indicates, that the combination is safe or effective in humans for any use Empower advertises. Measured against the Product Empower actually sells, its claims of clinically "demonstrated" function and "proven" results are false.

45. Empower went further still, ascribing to the combination a set of therapeutic uses for which it holds no evidence whatever. Empower told consumers that the Product could be "implemented as a second-line defense against type 2 diabetes for glycemic control," could "significantly reduce[] body weight," and could "help people with non-alcoholic fatty liver

---

[20] Empower Pharmacy Tirzepatide/Niacinamide Injection Product Page, archived by the Internet Archive on March 21, 2025, https://web.archive.org/web/20250321033524/https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-niacinamide-injection/#productDetails.

[21] Compl. ¶¶ 2, 4, *Eli Lilly & Co. v. Empower Clinic Servs., LLC*, No. 2:25-cv-02183 (D.N.J. Apr. 1, 2025) (MOUNJARO® and ZEPBOUND® "have undergone 37 clinical trials"; "[n]one of the 37 clinical studies that Lilly completed" tested tirzepatide combined with niacinamide).

disease."[22] Each statement is presented to the consumer as an established property of Empower's Product. Yet each rests on studies conducted on a materially different product.

**iii. Empower's Compounded Semaglutide Products**

46. Empower's semaglutide line is marketed along similarly deceptive lines. Empower has marketed its compounded semaglutide/cyanocobalamin injection by directing consumers to clinical data generated in studies of FDA-approved semaglutide products, telling them that "[f]our clinical trials for weight management were conducted pre-approval" and that "more treated participants lost 5% up to 15% of their initial body weight vs. those taking placebo."[23] Those studies measured the performance of particular FDA-approved formulations, manufactured to approved specifications and administered under controlled conditions. They measured nothing about the semaglutide products Empower compounds, including their combination with other ingredients, their dosing, formulation and administration.

**b. Empower Deceptively Promotes the Products as "Personalized"**

47. The FDA defines the practice of compounding as mixing or altering the "ingredients of a drug to create a medication tailored to the needs of an individual patient."[24] Personalization, in this setting, is a set of capabilities: to choose what goes into the drug, to choose how much, and to leave out what a particular patient cannot tolerate.

48. Empower has made "personalization" a key part of the consumer messaging regarding its compounded medications, presenting itself as "at the forefront of personalized

[22] *Id.*

[23] Empower Pharmacy, Semaglutide / Cyanocobalamin Injection Product Page, archived by the Internet Archive on March 17, 2025, https://web.archive.org/web/20250317014139/https://www.empowerpharmacy.com/compounding-pharmacy/semaglutide-cyanocobalamin-injection/.

[24] FDA, Human Drug Compounding (Dec. 18, 2024), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding

healthcare," "tailoring medications to meet [patients'] unique needs,"[25] and calling the Products "personalized formulations."[26] It has claimed to supply "patient specific medications,"[27] and to be "utiliz[ing] the latest pharmaceutical technology-driven processes to produce compounded drugs tailored to fit individual patients."[28] A consumer reading that language understands that what arrives was made for them.

49. In reality, Empower's Products do not offer any personalization. For each of the Products, Empower publishes a single formulation in fixed sets of predetermined dosages.[29]

50. Empower's facilities are configured for mass production, not individualized compounding. Empower touts that in 2023 it "fill[ed] 15,000 custom-compounded prescriptions daily," and that its East Windsor Facility has the capacity to produce 50 million vials per year. Empower has further described its operations as "commercial-scale production."[30]

51. Empower's characterization of its mass-produced, standardized products as "personalized" is deceptive.

---

[25] Empower Pharmacy, Compounding Pharmacies' Vital Role in Patient Care, https://www.empowerpharmacy.com/compound-medication/news/compounding-empowers-patient-care/.

[26] Empower Pharmacy, Weight Management Medications, https://www.empowerpharmacy.com/compound-medication/weight-management/.

[27] *Id.*

[28] Empower Pharmacy, Our 503A Facility, https://www.empowerpharmacy.com/about/technology-innovation/facilities/503a/ (last accessed Mar. 30, 2026).

[29] Empower Pharmacy Tirzepatide ODT Product Page, https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-odt/; Empower Pharmacy Semaglutide / Methylcobalamin ODT Product Page, https://www.empowerpharmacy.com/compounding-pharmacy/semaglutide-methylcobalamin-odt/; Empower Pharmacy Tirzepatide/Niacinamide Injection Product Page, https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-niacinamide-injection/; Empower Pharmacy Semaglutide / Cyanocobalamin Injection Product Page, https://www.empowerpharmacy.com/compounding-pharmacy/semaglutide-cyanocobalamin-injection/.

[30] Empower Pharmacy, Who We Are, https://www.empowerpharmacy.com/about/our-story/; PR Newswire, Empower Pharma to Purchase Eugia Manufacturing Facility in New Jersey for Large Scale Expansion of Personalized Compounded Medicine (Feb. 5, 2024), https://www.prnewswire.com/news-releases/empower-pharma-to-purchase-eugia-manufacturing-facility-in-new-jersey-for-large-scale-expansion-of-personalized-compounded-medicine-302053371.html.

### c. Empower Falsely Advertises Safety and Manufacturing Quality

52. Empower advertises its manufacturing operation to consumers as a model of regulatory compliance, telling them that it "adheres to stringent regulations set by State Boards of Pharmacy, the FDA, and USP standards, and even voluntary quality testing,"[31] and that its "multi-pronged quality process adheres to stringent regulatory standards across every step—from ingredient sourcing to fulfilment [sic]—so the medications [it] send[s] out are of the highest caliber every time."[32]

53. Those claims are false. Since 2015, FDA inspections, four Warning Letters, action by seven state pharmacy boards, three recalls, and the accounts of Empower's own former employees have laid bare an operation run for volume rather than for patient safety.

#### i. The Regulatory Record

54. The FDA has documented deficiencies in Empower's sterile operations in inspection after inspection. Inspectors found bacterial contamination of an injectable medication, and Empower's failure to investigate, along with no written program for testing drug stability in 2015;[33] unrecorded production temperatures and inadequate environmental controls in 2020;[34] rust in the critical areas where sterile drugs were filled, and unsterilized containers and closures, in 2022;[35] "poor aseptic techniques," including technicians rarely changing gloves and instances of

[31] Empower Pharmacy, Compounding Personalized Healthcare: Shaun Noorian Interviews with Mark Bishop, https://www.empowerpharmacy.com/compound-medication/news/empower-pharmacy-compounding-personalized-healthcare/.

[32] Empower Pharmacy, Technology & Innovation, https://www.empowerpharmacy.com/about/technology-innovation/.

[33] FDA Form 483 to Empower Clinic Services, LLC (Nov. 25, 2015), https://www.fda.gov/media/95350/download.

[34] FDA Form 483 to Empower Clinic Services LLC (Mar. 6, 2020), https://www.fda.gov/media/137544/download.

[35] FDA Form 483 to Empower Clinic Services LLC (Aug. 5, 2022), https://www.fda.gov/media/162155/download.

equipment left uncleaned, in 2023;[36] and, in 2024, a technician retrieving scissors from the floor of a controlled area and returning them to a sterile compounding hood, together with the release of a sterile batch after environmental monitoring detected microbial growth.[37]

55. Empower's ingredients were no better controlled. In 2019 the FDA found 18 bulk drug substances ineligible for sterile compounding in use at Empower, called its response to earlier requests that it stop "inadequate," and recorded that Empower had "declin[ed] to discontinue serving its patients and customers with these . . . drug products compounded using bulk substances."[38] Later inspections found active ingredients never verified as suitable for use in drugs, and components that were not pharmaceutical grade.[39] Across 2020, 2022, and 2024 the FDA also cited deficient quality-unit procedures, labels omitting adverse-event reporting instructions, uninvestigated complaints (roughly twenty of them concerning drugs that did not work), an uninvestigated report of fungi in a medication batch, and unreported adverse events.[40]

56. Four Warning Letters record the agency's judgment that these were not isolated lapses. In 2017 the FDA found "serious deficiencies in [Empower's] practic[es] . . . which put patients at risk" and "significant [current good manufacturing practice] violations," faulted Empower for producing drugs without valid prescriptions for individually identified patients, and could not assess Empower's claimed corrections because Empower's response did not include

---

[36] FDA Form 483 to Empower Clinical Services, LLC (Dec. 1, 2023), https://www.fda.gov/media/176194/download.

[37] FDA Form 483 to Empower Pharmacy (Aug. 28, 2024), https://www.fda.gov/media/182593/download.

[38] Letter from Monica Maxwell, Program Division Director, FDA Office of Pharmaceutical Quality Operations Division II, to Arta Shaun Noorian, CEO, Empower Pharmacy (July 22, 2019), https://www.fda.gov/media/130590/download.

[39] FDA Form 483 to Empower Clinic Services LLC (Aug. 5, 2022), https://www.fda.gov/media/162155/download.

[40] FDA Form 483 to Empower Clinic Services LLC (Mar. 6, 2020), https://www.fda.gov/media/137544/download, FDA Form 483 to Empower Pharmacy (Aug. 5, 2022), https://www.fda.gov/media/162155/download, FDA Form 483 to Empower Pharmacy (Aug. 28, 2024), https://www.fda.gov/media/182593/download.

supporting documentation.[41] In 2021 it found Empower's adverse-event reporting procedures "inadequate" and its corrective actions "appear[ed] deficient."[42] The 2025 Warning Letter, issued April 2, 2025, cited "serious deficiencies" in Empower's practices for producing drug products, "which put patients at risk," including that "FDA investigators noted that drug products intended or expected to be sterile were prepared, packed, or held under insanitary conditions, whereby they may have become contaminated with filth."[43]

57. Most recently, on September 18, 2026, the FDA issued Empower a fourth Warning Letter, following a November 2025 inspection of its Houston facility, directed at the very GLP-1 Products at issue here. The FDA found that Empower "compounded drug products that are essentially copies of commercially available drug products regularly and in inordinate amounts," naming Empower's tirzepatide/niacinamide and semaglutide/cyanocobalamin injections, and concluded that "[t]he volume of products [Empower is] producing suggests that differences between products [it is] compounding and the FDA-approved products are pretextual." The agency's evidence included prescriptions that "lack any prescriber determination of significant difference from the commercially available product" and others bearing purported determinations "repeated verbatim across many records, suggesting that they may be pre-generated for selection by the prescriber, rather than written by the prescriber for an identified individual patient." The

---

[41] Letter from Monica Maxwell, Acting Program Division Director, FDA Office of Pharmaceutical Quality Operations Division II, to Arta Shaun Noorian, Owner, Empower Pharmacy (May 25, 2017), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/empower-clinic-services-llc-dba-empower-pharmacy-516718-05252017.

[42] Letter from Tamala Bogan, Acting Program Division Director, FDA Office of Pharmaceutical Quality Operations Division II, to Arta Shaun Noorian, Owner, Empower Pharmacy (Oct. 15, 2021), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/empower-clinic-services-llc-dba-empower-pharmacy-613792-10152021.

[43] Warning Letter from FDA Office of Pharmaceutical Quality Operations Division II to Empower Clinic Services, LLC dba Empower Pharmacy, WL #700964 (Apr. 2, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/empower-clinic-services-llc-dba-empower-pharmacy-700964-04022025.

FDA again "noted serious deficiencies in [Empower's] practices for producing drug products, which put patients at risk"; found that drug products intended to be sterile "were prepared, packed, or held under insanitary conditions, whereby they may have become contaminated with filth or rendered injurious to health"; cited five "significant CGMP violations," including the failure of Empower's quality control unit "to exercise its responsibility to ensure drug products manufactured are in compliance with CGMP"; and determined that the products were both unapproved new drugs and misbranded. The FDA further found Empower's post-inspection corrective actions "deficient," because the records of Empower's own sterility-assurance test did not "clearly demonstrate that all vials were accounted for and inspected," and "strongly recommend[ed]" that Empower retain "[a] third party consultant with relevant sterile drug manufacturing expertise" to conduct "a comprehensive assessment of operations."[44]

58. State regulators reached the same conclusions independently. Empower's 2022 Stipulated Settlement and Disciplinary Order with the California Board of Pharmacy resolved charges including dispensing adulterated preparations, unlawfully compounding commercially available products, sourcing ingredients from suppliers not registered with the FDA, misbranding, and failing to report adverse effects; Empower conceded that the charges rested on a factual basis the Board could have proved at a hearing.[45] Colorado admonished Empower in 2021 and fined it

[44] Warning Letter from Clint L. Narver, Director, Office of Compounding Quality and Compliance, FDA Center for Drug Evaluation and Research, to Arta Shaun Noorian, Founder & Chief Executive Officer, Empower Clinic Services, LLC dba Empower Pharmacy, WL #738238 (Sept. 18, 2026), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/empower-clinic-services-llc-dba-empower-pharmacy-738238-09182026.

[45] Corrected Decision and Order, In the Matter of the Accusation Against Empower Clinic Services, LLC, DBA Empower Pharmacy, Board of Pharmacy Department of Consumer Affairs State of California (Jan. 18, 2023) at 10, https://www.pharmacy.ca.gov/enforcement/fy2021/ac207117.

in 2023;[46] Florida reprimanded Empower and assessed investigative costs, and Pennsylvania levied a $10,000 civil penalty, each on the strength of the California discipline;[47] Idaho fined Empower $15,000 in 2019 for dispensing prescriptions to Idaho residents written by a prescriber not licensed there;[48] Iowa imposed a $25,000 penalty and three years' probation, upheld against Empower's appeal;[49] and Oklahoma imposed a $37,200 penalty and two years' probation by consent order in June 2018 for compounding drugs that copied commercially available FDA-approved products.[50] Empower has also recalled compounded drugs at least three times in three years, once for mislabeling and at least twice for lack of sterility.[51]

---

[46] *See* Letter of Admonition from Colo. State Bd. of Pharmacy to Empower Pharmacy, Case No. 2021-3810 (Sept. 17, 2021); Stipulation and Final Agency Order, In the Matter of Empower Pharmacy, Bd. Case No. 2023-1306, Registration No. PDO OSP.0006131 (Aug. 8, 2023) ($1,000 fine plus 15% surcharge).

[47] Administrative Complaint, *State of Florida Dep't. of Health v. Empower Clinic Services, LLC, No. 2023-03021*, (June 22, 2023), https://mqa-internet.doh.state.fl.us/MQASearchServices/HealthCareProviders/LicenseVerification?LicInd=442&ProCde=2210&dba=Empower%20Pharmacy&org=EMPOWER%20CLINIC%20SERVICES%2C%20LLC; Final Order Accepting Settlement Agreement, *Dep't of Health v. Empower Clinic Servs., LLC*, No. 2023-03021, Final Order No. DOH-25-0478-S-MQA (Fla. Bd. of Pharmacy Mar. 13, 2025) (reprimand and $2,002.99 in investigative costs); Order, *Commonwealth of Pennsylvania Bureau of Professional and Occupational Affairs v. Empower Pharmacy Registration No. NP000041*, No. 20-54-000737 (Mar. 19, 2024) ($10,000 civil penalty), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/alerts-and-notices/bpoa-disciplinary-actions/2024/2024-March.pdf.

[48] Stipulation and Consent Order, *In re Empower Pharmacy*, Idaho State Bd. of Pharmacy Case No. BOP 18-053 (July 2, 2019), as recited in Third Am. Accusation ¶ 139, incorporated in Corrected Decision and Order, *In re Empower Clinic Servs., LLC*, Cal. Bd. of Pharmacy (Jan. 18, 2023) ($15,000 fine for dispensing 14 prescriptions to Idaho residents written by a prescriber not licensed in Idaho).

[49] *See In re Empower Pharmacy*, Iowa Bd. of Pharmacy Case No. 20PHB0001; *Empower Pharmacy v. Iowa Bd. of Pharmacy*, No. 22-0052 (Iowa Ct. App. Feb. 8, 2023) (affirming $25,000 civil penalty and three-year probation imposed for unauthorized HCG compounding for Iowa patients).

[50] Consent Order, *In re Empower Pharmacy*, Okla. State Bd. of Pharmacy, Complaint No. 99-7594, Case No. 1510 (June 13, 2018) ($37,200 civil penalty and two years' probation for compounding HCG products that were essentially copies of commercially available FDA-approved drugs), as recited in Third Am. Accusation ¶ 138, incorporated in Corrected Decision and Order, *In re Empower Clinic Servs., LLC*, Cal. Bd. of Pharmacy (Jan. 18, 2023).

[51]*See* FDA Enforcement Report D-0865-2023 (Empower mislabeling recall of Ascorbic Acid Preserved Injection 500 mg/mL, initiated May 12, 2023), https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=200587; FDA Enforcement Report D-0630-2024 (Empower sterility recall of Estradiol Cypionate Injection 10 mg/mL, initiated Aug. 2, 2024), https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=209417; FDA Enforcement Report D-0420-2025 (Empower Clinic Services Recall of Testosterone Cypionate Injection 200 mg/mL, initiated May 2, 2025, lack of assurance of sterility), https://www.accessdata.fda.gov/scripts/ires/index.cfm?Product=213704; all available via FDA Enforcement Reports Search, https://www.accessdata.fda.gov/scripts/ires/index.cfm.

### ii. East Windsor, Insiders, and Outside Scrutiny

59. Empower bought the East Windsor Facility from Eugia Pharma Specialties Limited in 2024, weeks after FDA inspectors documented significant deficiencies there, including cleaning and disinfection procedures that had never been validated and inadequate environmental monitoring in aseptic areas.[52] Empower nonetheless announced a "state-of-the-art facility" capable of producing "50 million vials, or $1.5B in revenue per year."[53] A Form 483 issued after the first inspection under Empower's ownership, in November 2024, documented standard operating procedures its quality unit had never approved, laboratory controls without validated test methods, endotoxin testing that Empower's own protocols required but no one performed, and pathogenic bacteria in the facility's water systems: 49 colonies in one system and 401 in another, among them Burkholderia cepacia and Ralstonia insidiosa.[54]

60. Empower's former Director of Supply Chain, Samuel Pray, has alleged in civil litigation that Empower compounded consumer products, injectables included, using adulterated active pharmaceutical ingredients; that Empower's CEO instructed staff to buy food or animal grade (rather than pharmaceutical grade) active ingredients, and that the best time to do so was after an FDA inspection because the agency was unlikely to return soon; that ingredients were ordered from Gmail and Yahoo email accounts purporting to be middlemen for FDA-registered

---

[52] FDA Form 483 Report to Eugia US Manufacturing LLC (Dec. 22, 2023), https://www.fda.gov/media/175809/download.

[53] PR Newswire, Empower Pharma to Purchase Eugia Manufacturing Facility in New Jersey for Large Scale Expansion of Personalized Compounded Medicine (Feb. 5, 2024), https://www.prnewswire.com/news-releases/empower-pharma-to-purchase-eugia-manufacturing-facility-in-new-jersey-for-large-scale-expansion-of-personalized-compounded-medicine-302053371.html.

[54] FDA Form 483 to Empower Clinic Services New Jersey LLC (Nov. 18, 2024), available at https://www.safemedicines.org/wp-content/uploads/2025/07/Empower-Clinic-Services-New-Jersey-LLC-Form-483-2024-11-18.pdf; *see also* Partnership for Safe Medicines, An FDA inspection revealed significant problems at Empower's new outsourcing facility (July 14, 2025), https://www.safemedicines.org/2025/07/empower-new-facility-inspection.html (summarizing the Form 483 and noting that Burkholderia cepacia "is resistant to many different kinds of antibiotics" and that Ralstonia insidiosa "can grow and survive in any kind of water").

suppliers, without verification of the source or testing of the ingredients; that Empower falsely reported to the FDA the corrective actions it claimed to have taken after FDA inspections; and that Empower used intimidation and retaliation to deter employees from raising concerns.[55]

61. Investigative reporting has reached the same conclusions. The Houston Chronicle catalogued a decade of FDA citations in May 2025 and reported that Empower "has grown into a top compounding pharmacy in the nation despite a decade of documented regulatory violations."[56] In June 2026, the Chronicle published a five-part investigation of Empower and the compounding industry, "A Dose of Disruption," reporting that the FDA has repeatedly issued Empower warning letters over the past decade.[57] Endpoints News reported that, based on the accounts of former employees and the FDA's own records, Empower "used poor-quality ingredients" and "skirted regulations."[58] The Partnership for Safe Medicines, a pharmaceutical-safety watchdog, covered the same period in "Empower Pharmacy's no good, very bad week," and reported that a 2024 inspection "revealed significant problems at Empower's new outsourcing facility."[59]

---

[55] *See* Defendant Sam Pray's Original Answer, Verified Denials, Affirmative Defenses, and Counterclaims (Jan. 27, 2025), *Empower Clinic Services, L.L.C. d/b/a Empower Pharmacy v. Samuel Pray*, et al., No. 2024-85045 (Tex. Dist. Ct., Harris Cnty.); Brief of Appellee, *Empower Clinic Servs., L.L.C. v. Pray*, No. 01-25-00410-CV (Tex. App.—Houston [1st Dist.] Sept. 19, 2025) (quoting the counterclaims and Pray's sworn testimony); *see also* Shelby Livingston, *Drug compounder Empower was built on risky shortcuts, ex-employees and inspections allege*, EndPoints News (May 15, 2025), https://endpoints.news/pharmacy-empower-allegedly-used-low-quality-ingredients-skirted-rules/.

[56] Julian Gill, Empower Pharmacy says it sells "quality" compounded drugs. 10 years of FDA violations raise doubts, Hous. Chron. (May 12, 2025), https://www.houstonchronicle.com/news/investigations/article/empower-pharmacy-compounded-drugs-fda-20281795.php.

[57] Julian Gill, A Dose of Disruption: How America's desire for GLP-1s and testosterone fueled the growth of Empower Pharmacy and roiled the drug industry, Hous. Chron. (five-part series, June 22–26, 2026), https://www.houstonchronicle.com/projects/2026/a-dose-of-disruption-investigative-series/.

[58] Shelby Livingston, Drug compounder Empower was built on risky shortcuts, ex-employees and inspections allege, Endpoint News (May 15, 2025), https://endpoints.news/pharmacy-empower-allegedly-used-low-quality-ingredients-skirted-rules/.

[59] Partnership for Safe Medicines, Empower Pharmacy's no good, very bad week (May 21, 2025), https://www.safemedicines.org/2025/05/empower-pharmacys-no-good-very-bad-week.html; Partnership for Safe Medicines, An FDA inspection revealed significant problems at Empower's new outsourcing facility (July 14, 2025), https://www.safemedicines.org/2025/07/empower-new-facility-inspection.html.

62. Empower presents sterling regulatory compliance and high-quality manufacturing quality as reasons consumers should buy its Products. The documented record establishes that those claims are illusory.

### D. DIRECT-TO-CONSUMER MARKETING AND CONSUMER RELIANCE

63. The misrepresentations described in this Complaint were not just addressed to physicians, pharmacists, or other prescribing or dispensing intermediaries. They were addressed directly to consumers.

64. Empower markets through channels expressly directed at end-user patients, including its public-facing website, its social-media accounts, and consumer-targeted campaigns.

65. Below are images from Empower's Instagram page, advertising its GLP-1 Products and offering information to consumers through hyperlinked advertisements.[60]

[60] Empower Pharmacy (@empowerpharmacy), GLP-1 Highlights, INSTAGRAM, https://www.instagram.com/stories/highlights/18043231951956633/; Empower Pharmacy, Understanding GLP-1 Receptor Agonists, https://www.empowerpharmacy.com/compound-medication/weight-management/understanding-glp-1-receptor-agonists/; Empower Pharmacy, Tirzepatide ODT Launch, https://www.empowerpharmacy.com/tirzepatide-odt-launch/.










66. Empower's shipping pages similarly speak directly to patients. Its product pages address consumers in the second person and describe the personal benefits patients can expect from Empower's compounded GLP-1 products.

67. Empower's marketing is consumer-facing not only in form but in design and

economic purpose. Empower's messaging—including its repeated invocations of "personalized" medications, claims about how its compounded GLP-1 products "contribute to a decreased appetite" and "influence fat metabolism,"[61] references to clinical-trial results and to "proven" outcomes, and convenience-based positioning ("no needles, no refrigeration, no preparation")—is calibrated to influence patient demand. Consumers, not prescribers, are Empower's target audience, and consumers' demand for Empower's compounded GLP-1 products is the lifeblood of Empower's revenue model.

68. Plaintiffs and Class Members personally encountered Empower's consumer-facing marketing before or at the time they purchased or received Empower's compounded GLP-1 Products. Plaintiffs and Class members visited Empower's website and product pages, viewed Empower's social-media communications, and/or were exposed to Empower's direct-to-consumer representations through telehealth providers, clinics, and medical spas.

69. Plaintiffs and Class members reasonably relied on Empower's representations that its compounded GLP-1 products were safe, effective, clinically supported, personalized to individual patient needs, and manufactured in compliance with stringent safety standards.

70. Empower's representations regarding its prescription Products were aimed at end-user consumers, were calculated to drive consumer demand, and were in fact received and relied upon by consumers, including Plaintiffs and Class members.

71. Empower's direct-to-consumer marketing model also distinguishes Empower from a traditional patient-specific compounding pharmacy that fills individualized prescriptions written by a prescribing physician based on the prescriber's independent professional judgment.

[61] Empower Pharmacy, Tirzepatide ODT Product Page, archived by the Internet Archive on February 21, 2025, https://web.archive.org/web/20250221181634/https://www.empowerpharmacy.com/compounding-pharmacy/tirzepatide-odt/.

Empower's marketing both creates the consumer demand and shapes the very content of the prescriptions by promoting Empower-specific formulations (such as tirzepatide combined with niacinamide, or semaglutide combined with cyanocobalamin) that have no FDA-approved counterpart.

72. No prescribing intermediary stands between Empower's representations and the consumers who relied on them.

73. When a visitor scrolls over the "Who We Serve" text at the top of Empower's website, Empower makes clear that it provides services directly to patients, and even includes a link for patients to request a refill.[62]




## E. HARM TO CONSUMERS

74. As a direct result of Empower's uniform deceptive marketing practices, consumers who purchased or received Empower's compounded GLP-1 Products were misled into believing

[62] Empower Pharmacy, Who We Serve, https://www.empowerpharmacy.com/.

that they were receiving medications that: (a) had been clinically tested and proven safe and effective; (b) functioned comparably to FDA-approved GLP-1 medications; (c) were manufactured under regulatory standards comparable to those applicable to approved pharmaceutical products; and (d) were individually tailored to their medical needs. Had consumers not been misled in one or more of the foregoing manners, they would not have purchased the Products, or in the alternative, would not have purchased them at the price they paid.

75. Independent pharmacovigilance data indicate that consumers who used compounded GLP-1 products may face safety risks different from those experienced by consumers of non-compounded counterparts. A peer-reviewed analysis of the FDA Adverse Event Reporting System (FAERS) identified 81,078 adverse-event reports involving GLP-1 receptor agonist medications, of which 707 reports involved compounded products. Comparing the compounded subset to non-compounded products, the study reported elevated reporting-odds ratios (ROR) for abdominal pain (ROR 2.84), diarrhea (ROR 1.59), nausea (ROR 1.27), cholecystitis (ROR 3.39), suicidality (ROR 6.34), and hospitalization (ROR 2.35). These reporting-odds ratios indicate that consumers of compounded GLP-1 products such as those produced by Empower may face elevated risks of serious adverse events. The FDA has separately warned of multiple reports of adverse events—some requiring hospitalization—potentially associated with dosing errors involving compounded injectable semaglutide products.[63]

76. Existing litigation has likewise placed the safety of Empower's compounded GLP-

---

[63] *See* Kenneth L. McCall et al., *Safety Analysis of Compounded GLP-1 Receptor Agonists: A Pharmacovigilance Study Using the FDA Adverse Event Reporting System, 25 Expert Opinion on Drug Safety* 581 (2026), https://doi.org/10.1080/14740338.2025.2499670 (reporting elevated reporting-odds ratios for hospitalization, suicidality, cholecystitis, and other adverse events for compounded GLP-1 products compared to non-compounded counterparts); *see also* FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (Mar. 17, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss (reporting adverse events, including hospitalizations, associated with dosing errors involving compounded injectable semaglutide).

1 products at issue. In *Stash v. Empower Clinic Services, LLC d/b/a Empower Pharmacy*, the family and estate of Shawna Stash allege that compounded semaglutide/cyanocobalamin injection dispensed by Empower caused her death.[64]

77. Consumer feedback channels further corroborate dissatisfaction with Empower's compounded GLP-1 Products. On Trustpilot, Empower carries an average rating of approximately 2.1 out of 5 stars, with approximately 77 percent of reviewers issuing one-star ratings.[65] Separately, the FDA's 2024 Form 483 documents that, as of August 2024, Empower had failed to investigate approximately twenty consumer complaints concerning the lack of efficacy of its compounded drug products dating back to August 2022, indicating that consumer complaints reached Empower but were not addressed.

## PLAINTIFFS' EXPERIENCES

### A. Nicholas Forcier

78. Plaintiff Forcier's experience is typical of consumers who were misled into purchasing Empower's products. Mr. Forcier's first exposure to GLP-1 products was through ZEPBOUND, manufactured by Lilly. ZEPBOUND's active ingredient is tirzepatide.

79. Mr. Forcier sought more cost-effective—though still safe—alternatives to ZEPBOUND. He eventually received a compounded tirzepatide product through a telehealth company named Mochi Health.

80. In the late spring of 2025, Mochi Health informed Mr. Forcier that it would start providing and charging him for Empower's GLP-1 Products.

---

[64] *Stash v. Empower Clinic Servs., LLC d/b/a Empower Pharmacy*, No. 2026-24311 (Tex. Dist. Ct., Harris Cnty. filed Apr. 10, 2026); *see* Mark Payne, *Texas GLP-1 Compounder Caused Mom's Death, Family Says*, Law360 (Apr. 13, 2026), https://www.law360.com/articles/2464464/texas-glp-1-compounder-caused-mom-s-death-family-says.

[65] Trustpilot, *Empower Pharmacy Reviews*, https://www.trustpilot.com/review/empowerpharmacy.com (last visited Sept. 8, 2026) (approximately 2.1/5 average rating across 42 consumer reviews, with approximately 77% one-star ratings).

81. Mr. Forcier promptly researched Empower from his home in New York. He soon saw that they touted and sold their products directly to consumers. Indeed, he was surprised to see that Empower's website was easy to follow and consumer-facing, while he expected a pharmaceutical website to be more "sterile" in appearance. He also noted numerous consumer reviews promoted through the website.

82. In particular, Mr. Forcier felt that the website sought to inspire confidence regarding the quality of the medications Empower produced. The website featured specific sections regarding product quality and represented that Empower followed all appropriate steps with regard to sterility and quality assurance, all surrounded by imagery (of sterile facilities) implying that Empower ran a highly professional operation. Safety and quality assurance were particularly important to him in making his decision to continue purchasing Empower's GLP-1 Products.

83. Mr. Forcier also noticed Empower's representations that their products were individualized and tailored to a specific patient's needs. He also noticed representations surrounding Empower's compliance with FDA rules and regulations.

84. Ultimately, Mr. Forcier's impression was that Empower's GLP-1 Products were "above board," safe, effective, manufactured in compliance with FDA regulations, and that the company was highly focused on the sterility of its manufacturing facilities.

85. Due to the representations on Empower's website, Mr. Forcier purchased tirzepatide produced by Empower through Mochi Health from in or around June 2025 to in or around November 2025. Mr. Forcier paid approximately $199 for each month-long supply of Empower's GLP-1 Products for a total of approximately $1,194.

86. Had Mr. Forcier known the truth about Empower's GLP-1 Products, he would not have purchased them.

**B. Tameka Watson**

87. Tameka Watson's experience with Empower's GLP-1 Products was similar to Mr. Forcier's. She reviewed Empower's website before purchasing any products from it and came away with the impression that the GLP-1 Products were safe, manufactured in a sterile environment, and FDA-approved. But for the representations on Empower's website, she would not have purchased the Products.

88. After researching GLP-1 products from her home in Illinois, Ms. Watson signed up for the services of a telehealth company named Elevate Health, through the website www.JoinElevate.com.

89. An Elevate-affiliated practitioner prescribed Ms. Watson a GLP-1. Elevate informed Ms. Watson that Empower would fill the order.

90. Before purchasing the product, Ms. Watson reviewed Empower's website to ensure it was legitimate. Ms. Watson was reassured by the representations on Empower's website regarding its FDA certifications. Based on the representations on Empower's website, Ms. Watson understood the GLP-1 products Empower sold to be FDA-approved.

91. In May 2026, based on Empower's representations, Ms. Watson paid $499 for a three-month supply of Empower's compounded semaglutide product.

92. Ms. Watson made the purchase under the impression that Empower's GLP-1 Products were FDA-approved, safe, and effective. Had she known the truth (that Empower's products were not in fact tested or approved by the FDA), she would not have made the purchase.

## CLASS ACTION ALLEGATIONS

93. Plaintiffs bring this action on behalf of themselves and the following Classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

> **Nationwide Class:** All persons in the United States who, during the applicable statute of limitations period ("Class Period"), purchased or received compounded GLP-1 medications (including compounded semaglutide and compounded tirzepatide formulations) manufactured by Empower Clinic Services, LLC or Empower Clinic Services New Jersey LLC.
>
> **New York Subclass:** All members of the Nationwide Class who purchased or received the challenged products in New York.
>
> **Illinois Subclass:** All members of the Nationwide Class who purchased or received the challenged products in Illinois.
>
> Excluded from the Classes are: (a) Defendants and their officers, directors, employees, agents, and affiliates; (b) any entity in which Defendants have a controlling interest; (c) the judge to whom this case is assigned and any member of the judge's immediate family and judicial staff; (d) attorneys for Plaintiffs and Defendants and their staff; and (e) healthcare providers, telehealth companies, clinics, pharmacies, and medical spas that purchased Empower products for resale or administration and who are not also end-user patients.

94. **Numerosity (Rule 23(a)(1))**: The Classes are so numerous that joinder of all members is impracticable. Empower distributes its products directly to consumers and through healthcare providers, telehealth companies, and clinics nationwide, and upon information and belief, thousands of consumers have purchased or received the Products during the relevant period.

95. **Commonality (Rule 23(a)(2))**: There are questions of law and fact common to the Classes that predominate over any individual questions, including: (a) whether Empower's marketing of its compounded GLP-1 Products as safe, effective, and clinically supported was false or misleading; (b) whether Empower's marketing of its compounded GLP-1 Products as "personalized" was false or misleading; (c) whether Empower's representations regarding safety and regulatory compliance, and manufacturing quality, were false or misleading; (d) whether

Empower's representations had the capacity, tendency, or likelihood of deceiving reasonable consumers; (e) whether Empower's conduct violated the New Jersey Consumer Fraud Act; (f) whether Empower's conduct violated state false advertising, unfair competition, and other consumer protection laws; (g) whether Class members are entitled to restitution, damages, and/or other monetary relief; and (h) the appropriate measure of relief.

96. **Typicality (Rule 23(a)(3))**: Plaintiffs' claims are typical of the claims of the Class members because Plaintiffs and all Class members were exposed to the same uniform misrepresentations, purchased or received the same categories of products, and were injured through the same course of deceptive conduct.

97. **Adequacy (Rule 23(a)(4))**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are consistent with and not antagonistic to those of the Class members, and Plaintiffs have retained counsel experienced in class action litigation.

98. **Predominance and Superiority (Rule 23(b)(3)):** Common questions of law and fact predominate over any individualized questions because Empower's challenged representations were materially uniform and disseminated through standardized marketing channels, including its website, social media pages, and promotional materials. A class action is the superior method for the fair and efficient adjudication of these claims because the damages suffered by individual Class Members may be relatively small compared to the cost of individual litigation, making individual actions impractical for most Class members.

**FIRST CAUSE OF ACTION**
**Violation of the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 *et seq*.**
**(On Behalf of Plaintiffs Forcier, Watson, and the Nationwide Class)**

99. Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

100. The New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-2, prohibits the

use or employment of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise.

101. The Products constitute "merchandise" within the meaning of the NJCFA.

102. As alleged above, on information and belief, the Products purchased by Plaintiffs and Class members were compounded at and/or shipped from Empower's East Windsor Facility, and the representations challenged herein were made and disseminated from New Jersey and/or Texas.

103. Empower willfully engaged in deceptive acts and practices in violation of the NJCFA by, among other things: (a) falsely marketing and selling its compounded GLP-1 Products as safe, effective, and clinically supported treatments; (b) falsely marketing and selling its compounded GLP-1 products as "personalized," "custom," and "tailored" to individual patient needs, when in fact Empower mass-produces standardized formulations in predetermined dosages; and (c) falsely representing that Empower adheres to stringent safety requirements and maintains high-quality manufacturing standards, when there are repeated, documented serious safety and compliance deficiencies at Empower's facilities.

104. Furthermore, having affirmatively made the aforementioned representations, Empower willfully engaged in deceptive acts and practices in violation of NJCFA by omitting the material facts that its products have not undergone clinical testing, are not safe and effective, consist of mass-produced standardized formulations dispensed in predetermined dosages, and are not manufactured in safe and sterile environments—omissions that rendered Empower's own affirmative representations materially misleading.

105. Empower's misrepresentations and omissions are material because they concern the fundamental safety, effectiveness, quality, and nature of the products consumers are purchasing for the treatment of serious medical conditions. A reasonable consumer would consider these facts significant in deciding whether to purchase Empower's compounded GLP-1 Products.

106. Empower's consumer-oriented conduct has deceived, is likely to deceive, and has the capacity and tendency to deceive reasonable consumers.

107. As a direct and proximate result of Empower's violations of the NJCFA, Plaintiffs and Class Members have suffered ascertainable losses, including but not limited to the amounts paid for the Products and/or the price premium paid.

## SECOND CAUSE OF ACTION
## Violation of the New York General Business Law § 349
## (On Behalf of Plaintiff Forcier and the New York Subclass)

108. Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

109. New York General Business Law ("GBL") § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

110. Empower engaged in consumer-oriented conduct within the meaning of § 349 by marketing, labeling, advertising, and selling the Products to the public throughout the State of New York.

111. Empower willfully engaged in deceptive acts and practices in violation of GBL § 349 by, among other things (a) falsely marketing and selling its compounded GLP-1 Products as safe, effective, and clinically supported treatments; (b) falsely marketing and selling its compounded GLP-1 products as "personalized," "custom," and "tailored" to individual patient needs, when in fact Empower mass-produces standardized formulations in predetermined dosages; and (c) falsely representing that Empower adheres to stringent safety requirements and maintains

high-quality manufacturing standards, when there are repeated, documented serious safety and compliance deficiencies at Empower's facilities.

112. Furthermore, having affirmatively made the aforementioned representations, Empower engaged in deceptive acts and practices by omitting the material facts that its products have not undergone clinical testing, are not safe and effective, consist of mass-produced standardized formulations dispensed in predetermined dosages, and are not manufactured in safe and sterile environments—omissions that rendered Empower's own affirmative representations materially misleading.

113. Empower's misrepresentations and omissions are material because they concern the fundamental safety, effectiveness, quality, and nature of the products consumers are purchasing for the treatment of serious medical conditions. A reasonable consumer would consider these facts significant in deciding whether to purchase Empower's compounded GLP-1 Products.

114. Empower's consumer-oriented conduct has deceived, is likely to deceive, and has the capacity and tendency to deceive reasonable consumers.

115. As a direct and proximate result of Empower's violations of GBL § 349, Plaintiffs and Class Members have suffered ascertainable losses, including but not limited to the amounts paid for the Products and/or the price premium paid.

**THIRD CAUSE OF ACTION**
**Violation of New York General Business Law § 350 (False Advertising)**
**(On Behalf of Plaintiff Forcier and the New York Subclass)**

116. Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

117. GBL § 350 prohibits false advertising, defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," considering "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity."

118. Empower engaged in advertising within the meaning of § 350 by marketing, labeling, advertising, and selling the Products to the general public throughout the State of New York.

119. Empower willfully engaged in false advertising in violation of GBL § 350 by, among other things (a) falsely marketing and selling its compounded GLP-1 Products as safe, effective, and clinically supported treatments; (b) falsely marketing and selling its compounded GLP-1 Products as "personalized," "custom," and "tailored" to individual patient needs, when in fact Empower mass-produces standardized formulations in predetermined dosages; and (c) falsely representing that Empower adheres to stringent safety requirements and maintains high-quality manufacturing standards, when there are repeated, documented serious safety and compliance deficiencies at Empower's facilities.

120. Furthermore, having affirmatively made the aforementioned representations, Empower willfully engaged in false advertising by omitting the material facts that its products have not undergone clinical testing, are not safe and effective, consist of mass-produced standardized formulations dispensed in predetermined dosages, and are not manufactured in safe and sterile environments—omissions that rendered Empower's own affirmative representations materially misleading.

121. Empower's misrepresentations and omissions are material because they concern the fundamental safety, effectiveness, quality, and nature of the products consumers are purchasing for the treatment of serious medical conditions. A reasonable consumer would consider these facts significant in deciding whether to purchase Empower's compounded GLP-1 Products.

122. Empower's consumer-oriented conduct has deceived, is likely to deceive, and has the capacity and tendency to deceive reasonable consumers.

123. As a direct and proximate result of Empower's violations of GBL § 350, Plaintiffs and Class Members have suffered ascertainable losses, including but not limited to the amounts paid for the Products and/or the price premium paid.

**FOURTH CAUSE OF ACTION**
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2**
**(On Behalf of Plaintiff Watson and the Illinois Subclass)**

124. Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

125. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact […] in the conduct of any trade or commerce." 815 ILCS 505/2.

126. Empower's conduct, as described herein, constitutes unfair methods of competition and unfair or deceptive acts or practices under the ICFA.

127. Empower willfully engaged in unfair methods of competition and unfair or deceptive acts or practices in violation of 815 ILCS 505/2 by, among other things (a) falsely marketing and selling its compounded GLP-1 Products as safe, effective, and clinically supported treatments; (b) falsely marketing and selling its compounded GLP-1 Products as "personalized," "custom," and "tailored" to individual patient needs, when in fact Empower mass-produces standardized formulations in predetermined dosages; and (c) falsely representing that Empower adheres to stringent safety requirements and maintains high-quality manufacturing standards, when there are repeated, documented serious safety and compliance deficiencies at Empower's facilities.

128. Furthermore, having affirmatively made the aforementioned representations, Empower willfully engaged in false advertising by omitting the material facts that its products have not undergone clinical testing, are not safe and effective, consist of mass-produced standardized formulations dispensed in predetermined dosages, and are not manufactured in safe and sterile environments—omissions that rendered Empower's own affirmative representations materially misleading.

129. Empower's misrepresentations and omissions are material because they concern the fundamental safety, effectiveness, quality, and nature of the products consumers are purchasing for the treatment of serious medical conditions. A reasonable consumer would consider these facts significant in deciding whether to purchase Empower's compounded GLP-1 Products.

130. Empower's consumer-oriented conduct has deceived, is likely to deceive, and has the capacity and tendency to deceive reasonable consumers.

131. As a direct and proximate result of Empower's violations of 815 ILCS 505/2, Plaintiffs and Class Members have suffered ascertainable losses, including but not limited to the amounts paid for the Products.

## FIFTH CAUSE OF ACTION
## Breach of Express Warranty
## (On Behalf of Plaintiffs Forcier, Watson, and the Nationwide Class)

132. Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

133. Empower expressly warranted that the Products were clinically proven, safe, effective, and personalized, including through the affirmations of fact quoted above.

134. These warranties became part of the basis of the bargain between Plaintiffs and Nationwide Class Members and Empower.

135. Empower's warranties were directed to and intended to reach end-user consumers, including Plaintiffs, who paid for Empower's Products whether directly or through Empower's

telehealth and clinic partners.

136. Empower breached the warranties because the Products were not clinically proven, safe, effective, or personalized.

137. Empower had actual knowledge of the breaches alleged herein before this action was filed, including via the FDA's Warning Letters of May 25, 2017, October 15, 2021, April 2, 2025, and September 18, 2026, and the Form 483 inspection observations described above. Because Empower had actual knowledge of the breaches at issue, any pre-suit notice requirement, is satisfied or excused.

138. As a direct and proximate result of Defendant's breach, Plaintiffs and Nationwide Class members have been damaged in the amount of the purchase price of the Products and/or the price premium they paid.

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf Plaintiffs Forcier, Watson, and the Nationwide Class, in the Alternative)**

139. Plaintiffs repeat and reallege each allegation above as if fully set forth herein.

140. In the alternative, as a result of Empower's deceptive marketing practices described herein, Empower has been unjustly enriched at the expense of Plaintiffs and Class members.

141. Plaintiffs and Class members conferred a monetary benefit on Empower by purchasing or paying for Empower's compounded GLP-1 medications. Empower received and retained this benefit under circumstances that make it inequitable for Empower to retain it, because the purchases were made in reliance on Empower's material misrepresentations regarding the safety, effectiveness, clinical support, manufacturing standards, and personalization of its products.

142. Empower appreciated and knowingly accepted the benefits conferred by Plaintiffs

and Class members.

143. It would be inequitable for Empower to retain these benefits. Plaintiffs and Class members are entitled to restitution and disgorgement of the amounts unjustly retained by Empower.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Nicholas Forcier and Tameka Watson, individually and on behalf of the proposed Classes, respectfully pray that this Court enter judgment in their favor and against Defendants and award the following relief:

(a) Certifying this case as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and appointing Plaintiffs as class representatives and their counsel as Class counsel.

(b) An Order declaring that Empower's conduct as described herein violates the New Jersey Consumer Fraud Act, New York GBL §§ 349-350, and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505;

(c) An Order requiring Empower to engage in corrective advertising to inform consumers that its compounded GLP-1 Products have never been clinically tested for safety or effectiveness, are not personalized, and that Empower has a documented history of unsafe manufacturing conditions;

(d) An Order awarding Plaintiffs and Class members restitution of all monies paid for the challenged products,

(e) An Order awarding damages, including statutory damages and/or representing the difference in value between the Products as represented and

the products as actually received, i.e., 100% of the price paid;

(f) An Order awarding treble and/or punitive damages to Plaintiffs and Class Members;

(g) An Order awarding disgorgement of Empower's profits obtained through the challenged conduct

(h) An Order awarding Plaintiffs and Class members pre-judgment and post-judgment interest;

(i) An Order awarding Plaintiffs and Class members reasonable attorneys' fees and costs of suit;

(j) Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

Michael K. Halper
Halper Law
43 W. 43rd St., Suite 356
New York, NY 10036
Telephone: 646-416-9326
Email: michael@halper.law

Maxwell K. Weiss*
Don Bivens, PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Telephone: 602- 762-2661
Email: Max@donbivens.com

* Pro Hac Vice Forthcoming